IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SCOTT JACOBSON, *et al*.           *
                                                          *
                                                          *
               v.                                      *    Case No.: 1:09-cv-562
                                                          *
                                                          *
COMCAST CORPORATION., *et al*.   *
                                                          *
                                                     *****

OPINION

Plaintiffs, a group of cable technicians, have brought suit seeking overtime wage payments under the Fair Labor Standard Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, against Comcast, and companies that contracted with Comcast to install cable services for Comcast customers (Futuretek, Procom, and Conn-X) (collectively "Installation Companies"). There is no dispute that the Installation Companies employ Plaintiffs. Plaintiffs contend further that Comcast is their joint employer within the meaning of the FLSA.

Comcast has filed a motion for summary judgment. Broadly stated, the issue presented is whether a company (or other private venture) may, consistently with the remedial goals of the FLSA, contract with third parties who employ workers vital to the accomplishment of the company's business purposes in a manner providing the company with strict quality control over the performance of those workers without becoming liable for wages due the workers under the FLSA. Reasonable people may disagree about the answer to this question. My view is that the answer is "yes," provided that the fees paid by the company to the direct employers of the workers are sufficient to pay the workers the wages they are due. Here, Plaintiffs have not alleged that the fees paid by Comcast to the Installation Companies were not sufficient to cover

the FLSA wages plaintiffs claim. Therefore, I will grant Comcast's motion for summary judgment.

I.[1]

Comcast sells its services on a subscription basis, necessitating the installation of equipment in a customer's home to establish a connection with the Comcast network. (Pl.'s Mem. at 2; App. A, Comcast 10052791.) To provide these installation services, Comcast contracts with Installation Companies which, in turn, hire technicians to perform installations. (*Id.*) The terms of the contracts between Comcast and the Installation Companies expressly provide that the technicians are independent contractors of Comcast. (Def.'s Mem. at 7; Ex. D-1, Conn-X Agreement at ¶ 15(a); Ex. D-2, Procom Agreement at ¶ 1(e).)

The Installation Companies and Comcast have a close business relationship. Procom was founded by a former Comcast Senior Vice President with a $500,000 advance from Comcast. (Pl.'s Mem. at 41; Ex. 4, Donahue Dep. at 180.) The Installation Companies perform all, or the vast majority of their work for Comcast. (Pl.'s Mem. at 3; Ex. 1, Schreyer Decl. at ¶ 8.) All technicians are issued identification numbers by Comcast. (*Id.* at 4; Ex. 2, Selvyn Dep. at Ex. 2 thereto.) Comcast refers to its Installation Companies as "business partners." (*Id.* at 4; Ex. 2, Selvyn Dep. at 235-37.) All the equipment installed in customers' homes belongs to Comcast. However, the Installation Companies and the technicians own the necessary tools and equipment.

Plaintiffs contend that Comcast has the authority to prohibit the hiring of a prospective technician in its "sole and absolute discretion." (*Id.* at 14; Ex. 1, Schreyer Decl. at ¶ 19.) Andre Selvyn, Comcast's Manager of Business Partner Operations, sent an email in March 2009 to an Installation Company, informing them that "effectively [sic] immediately, all new hires from

---

[1] The facts, as I state them, are either undisputed or set forth in the light most favorable to the plaintiffs. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

2

your firms who will be representing Comcast must be approved by me. Please be sure to contact me before bringing on any new techs." (*Id.* at 14; Ex. 4, Donahue Dep. at Ex. 16 thereto.) Short of absolute authority over hiring, Comcast also requires all prospective technicians to pass a criminal background check and drug screening test before working on behalf of Comcast. (*Id.* at 13; Ex. 1, Schreyer Decl. at ¶ 21).

The Plaintiffs assert that Comcast exercises direct and indirect control over cable technicians once they are hired. Comcast requires Installation Companies to hire technicians as W2 employees, rather than 1099 independent contractors. (*Id.* at 5; Ex. 2, Selvyn Dep. at Ex. 2 thereto.) The contracts between Comcast and the Installation Companies specify the nature of the services they are to provide, and establish policies and procedures to which technicians must adhere. (*Id.* at 15; Ex. 5, Conn-X agreement.) Technicians are issued Comcast ID badges. (*Id* at 15; Ex. 2, Selvyn Dep. at 168.) By forwarding batches of service calls to the Installation Companies, Comcast directs technicians to specific work sites and details the timeframe in which jobs must be completed. (*Id.* at 23-24; Ex. 2, Selvyn Dep. at 88.) At times, Comcast contacts technicians directly to point them to particular jobs. (*Id.* at 27; Ex. 17 Waters Dep. at 62; Ex. 21, J. Jacobson Dep. at 66.)

Comcast also maintains strict supervision over the Installation Companies and the technicians. (*Id.* at 5; Ex. 1, Schreyer Decl. at ¶ 14.). Comcast utilizes a program called "Cable Data" which permits it to exercise real time monitoring of a technician's work. (*Id.* at 7; Ex. 2, Selvyn Dep. at 108-23.) For example, Selvyn informed Installers via email:

> I just ran a quick summary and below are the top 20 techs with craftsmanship issues last week. As discussed previously, the goal for this month is 14% SCOI;[2] at the end of the

---

[2] SCOI is "Service Call on Install," a metrics tool used by Comcast to measure the performance of cable technicians. (*Id.* at 19; Ex. 1 Schreyer Aff. at ¶ 13.)

3

month, we'll take a hard look at any tech above that threshold and decide whether or not their performance warrants continued representation of Comcast.

(*Id.* at 20; Ex. 5, Crouse Dep. at Ex. 11 thereto.) Comcast is able to monitor individual technicians to determine where they are, how long they are on site, and what equipment is being utilized. (*Id.* at 21; Ex. 21, J. Jacobson Dep. at 72.) Comcast retains records of technicians' arrival and departure times (*Id.* at 35; Ex. 4, Donahue Dep. at 190-91).

Comcast also has the authority to "deauthorize" a specific technician, which Plaintiffs contend amounts to the practical ability to fire. Deauthorization strips technicians of their status as an "authorized contractor," thereby prohibiting them from performing any work on behalf of Comcast. (*Id*. at 16; Ex. 14, Sadik Dep. at 13.) While Comcast notes that a deauthorized technician is not prohibited from continuing to work for an Installation Company in a position unassociated with Comcast, Plaintiffs contend that because the Installers only perform work for Comcast, deauthorization is tantamount to termination. (*Id.* at 16; Ex. 1, Schreyer Decl. at ¶ 9; Ex. 3, S. Jacobson Dep. at 143.)

Comcast does not pay technicians directly, but instead pays the Installation Companies for each service completed by their technicians. (*Id.* at 32; Ex. A.) The Installation Companies are then free to pay their technicians in whatever manner they see fit. (*Id.* at 32; Ex. 2, Selvyn Dep. at 235.) Plaintiffs contend that because Comcast pays per each completed service, Comcast exercises practical control over whether or not an individual technician will be paid for their work. (*Id.* at 34; Ex. 16, Roberts Dep. at 91 (explaining to a cable technician that if "Comcast says it's not going to pay you for this . . . [y]ou won't get paid for it").)

II.

The FLSA provides for a broad definition of employer and employee. *See Bonnette v. Cal. Health and Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983) (noting that employer and

employee are to be given broad interpretations in order to effectuate the FLSA's broad remedial purposes). Employer includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). An employee is defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The definition of "employ" is equally expansive, meaning "suffer or permit to work." 29 U.S.C. § 203(g). These definitions are broader than their common law counterparts. *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 69 (2d Cir. 2003).[3]

Under the FLSA, an individual may be the employee of more than one employer at a given time. *Schultz v. Capital Int'l Sec. Inc.,* 466 F.3d 298, 305 (4th Cir. 2006); *Bonnette v. Cal. Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983). According to FLSA implementing regulations, a joint employment relationship generally will be considered to exist in situations such as:

> 1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
>
> 2) Where one employer is acting directly or indirectly in the interests of the other employer (or employers) in relation to the employee; or

---

[3] The purpose of the FLSA has been said to be "humanitarian." *See Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944). Certainly, assuring that workers are paid wages they are lawfully due is "humanitarian," particularly under circumstances such as those presented in *Tennessee Coal*. Further, few would characterize Comcast or other large for-profit corporations as intrinsically humanitarian in nature. Recognition of the laudable aim of the FLSA cannot, however, constitute the end of analysis. Counterintuitive though it may seem to some, it can be legitimately asked whether it is in the public interest to prohibit the devising and implementation of the business plan that Comcast has intentionally adopted to insulate itself from being deemed to be an employer of installation technicians. Arguably, it is preferable not to divert resources from the field, where productive hands-on work is performed and where the number of hours worked by installation technicians can be directly monitored, to the centralized office bureaucracy that would be necessary if Comcast had to track and record the hours being worked by each technician. Of course, if Congress concludes Comcast and similarly situated companies should be deemed to be the employer of technicians under the FLSA, it can enact legislation so providing. However, the question now presented is whether it has already done so, and for the reasons stated in this Opinion, I do not believe it has.

5

> 3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b). If a joint employment relationship exists, all joint employers are jointly and individually liable for FLSA violations. *See* 29 C.F.R. § 791.2(a).

To determine whether an entity is a joint employer, a court must take into account the "real economic relationship" between the employee, employer, and putative joint employer. *Schultz v. Capital Int'l Sec. Inc.,* 466 F.3d 298, 306 (4th Cir. 2006); *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985). When evaluating a putative joint employment relationship, courts must effectuate the broad scope of the FLSA, while not construing the statute so broadly as to subsume typical independent contractor relationships. *See Zheng*, 355 F.3d at 76. Therefore, the economic reality test "is intended to expose outsourcing relationships that lack a substantial economic purpose, but it is manifestly not intended to bring normal strategically oriented contracting schemes within the ambit of the FLSA." *Id.*

There is no mechanical test to evaluate the "economic reality" between employees and putative joint employers. Courts have largely applied some variation of the following four factors:

> 1) Authority to hire and fire employees;
> 2) Authority to supervise and control work schedules or employment conditions;
> 3) Authority to determine the rate and method of payment; and
> 4) Maintenance of employment records.

*Bonnette*, 704 F.2d at 1470; *Brickey v. County of Smyth, Va.*, 944 F. Supp. 2d 1310, 1315 (W.D. Va. 1996); *Jackson v. Mayor of Baltimore*, 2009 WL 2060073 (D. Md. 2009). Where these four factors have been inconclusive, courts have looked at various miscellaneous factors, discussed in

Section IV, *infra*. *See, e.g.*, *Zheng*, 355 F.3d at 72.[4]  In considering these factors, a court need not decide that every one of them weighs against joint employment. *Zheng*, 355 F.3d at 77. Instead, the question of joint employment turns on the entire relationship, "viewed in its totality." 29 C.F.R. §825.106(b).

### III.

### A.

Comcast unquestionably plays a role in hiring and firing technicians. It requires that each technician pass a criminal background check and a drug test. Likewise, it reserves to itself the power to "deauthorize" technicians who install its equipment. Under the deauthorization process if Comcast receives information that a technician is performing installation work that does not meet standards set by Comcast, Comcast may advise the Installation Company that the technician no longer is authorized to perform installation work on behalf of Comcast. Because the Installation Companies have virtually no positions for a technician to fill other than performing installation work for Comcast, deauthorization in effect constitutes "firing."

---

[4] In *Schultz* the Fourth Circuit found it was unnecessary to apply the *Bonnette* and *Zheng* factors because the record established that relationship among the various defendants fell directly within the third example of joint employment provided in C.F. R. §791.2(a). 466 F.3d at 306, n.2. In denying a motion to dismiss, Judge Chasanow recently has cited *Schultz* as a basis for not considering the *Bonnette* and *Zheng* factors. *Deras v. Verizon Md., Inc.*, 2010 U.S. Dist. LEXIS 77249 (D. Md. July 30, 2010).
     Here, I do not believe that record can be fairly read as establishing that Comcast controls the Installation Companies or that Comcast and the Installation Companies are "under common control." All the record establishes is that Comcast and the Installation Companies have contracts with one another calling for the performance of work which is done by the technicians. Therefore, this is an appropriate case for me to weigh the *Bonnette* and *Zheng* factors, as the Fourth Circuit instructs I should do where an employment relationship falls outside the regulatory examples.

It is only in the context of quality control, however, that Comcast exercises power over the hiring or firing of technicians.[5] Installation Companies are free to hire anyone they choose to hire, provided that the applicants do not have a criminal record or fail a drug test. Likewise, an Installation Company has full authority to maintain the employment of the technicians, provided that a technician meets Comcast's quality performance standards, and to fire any technician that it believes should be fired, even if the technician meets Comcast's quality control standards.

B.

Under *Bonnette,* supervision and control is probative of an employment relationship only when the oversight demonstrates effective control over the schedule and conditions of employment. *See Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947) (finding control over putative employees when the putative employer directed changes in working conditions "many times a day"). The nature of the control exercised by putative joint employer is the key element in this analysis. This factor does not contemplate the generic control exercised by a supervisor over an independent contractor. *Chen v. Street Beat Sportswear*, 364 F. Supp. 2d 269, 286 (E.D.N.Y. 2005) (citing *Zheng*, 355 F.3d at 70). Therefore, detailed instructions and a strict quality control mechanism will not, on their own, indicate an employment relationship. *See, e.g.*, *Zheng*, 355 F.3d at 74-75 (citing *Rutherford*, 331 U.S. at 730 (concluding that extensive supervision indicates joint employment only if it amounts to effective control of the terms and

---

[5] There may be one exception to this general observation. As indicated in Section I, *supra,* Andre Selvyn, Comcast's Manager of Business Partner Operations, sent an email to an Installation Company stating that "all new hires from your firm who would be representing Comcast must be approved by me." (Pl.'s Mem. at 14; Ex. 4, Donahue Dep. at Ex. 16 thereto). In a subsequent email to Selvyn, a representative from the Installation Company indicated that they "would like to know if we could have [name redacted] approved for hire . . . we're waiting on your approval." (*Id.* at 15; App. A, Comcast 10019108). This email exchange, however, is limited to technicians employed at a single Installation Company. If Plaintiffs wish to press this point further, they may file a motion to reconsider the Opinion as to that Installation Company.

8

conditions of the plaintiff's employment)); *Moreau v. Air France*, 343 F.3d 1179, 1188 (9th Cir. 2003) (concluding that specific instructions to a service provider did not amount to joint employment); *Herman v. Mid-Atlantic Installation Serv.*, 164 F. Supp. 2d 667, 672 (D. Md. 2000) (concluding that Comcast's policy "requiring the Installers to meet . . . installation specifications is entirely consistent with the standard role of a contractor who is hired to perform highly technical duties"). Indeed, detailed instructions and close monitoring are key components in many independent contractor and franchise relationships.[6]

A high level of supervision and control is not an automatic trigger for joint employment. The nature of the control distinguishes employment and contractor relationships. In *Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2003), Air France was not found to be the joint employer of ground crew members, despite extensive supervision, specific performance requirements, and rigid quality control. *Moreau*, 356 F.3d at 951. In concluding that this type of control did not weigh in favor of a joint employment relationship, the court noted that the control was exercised to ensure passenger safety and therefore qualitatively different from the control exercised by an employer. *Id.* Similarly, in *Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1160 (C.D. Cal. 2003), the court concluded that Bebe stores did not exert the control or supervision typical of an employer even though Bebe employees constantly monitored the putative employees work for quality control purposes. The court found significant the fact that Bebe did not schedule work, control shifts, or specify individual assignments. *Id.*

---

[6] Courts evaluating franchise relationship for joint employment have routinely concluded that a franchisor's expansive control over a franchisee does not create a joint employment relationship. *See Singh v. 7-Eleven, Inc.*, 2007 U.S. Dist. LEXIS 16677, at *21 ("A franchisor must be permitted to retain such control as is necessary to protect and maintain its trademark, trade name and good will, without the risk of creating an agency relationship with its franchisees.") (internal citations omitted). Therefore, the nature and focus of the control are the critical components in evaluating an employment relationship.

9

In contrast to these cases, the court in *Torres-Lopez v. May*, 111 F.3d 633, 637 (9th Cir. 1997) concluded that a farm owner was the employer of harvesters in part because he supervised their picking routines, picking quality, and schedules, and selected the days which should be worked. Unlike *Moreau* and *Zhao*, the court concluded that this type of control amounted to the day to day management of the putative employees and therefore constituted joint employment. *Cf. Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947) (finding control over putative employees when the putative employer directed changes in working conditions "many times a day"). While the degree of supervision and control in each case was comparable, differences in the purpose and focus of the control produced the divergent conclusions.

In the instant case, Comcast maintains specific standards to which the Installation Companies and technicians must adhere, and regularly monitors the technicians to ensure that their performance satisfies Comcast's expectations. To that end, Comcast regularly monitors the location of technicians, specifies the time at which they are supposed to arrive at appointments, and regularly evaluates completed work to ensure that it meets standards. (Pl.'s Mem. at 21-27; Ex. 21, J. Jacobson Dep. at 72-73.) Comcast also occasionally contacts individual technicians to adjust their installation routines. (Pl.'s Mem. at 27; Ex. 17, Waters Dep. at 62; Ex. 21, Jacobson Dep. at 66.) However, Comcast is not responsible for the day-to-day management of the technicians. Comcast has no role in developing the Installation Company's human resource policies and does not dictate the technicians' working conditions, or determine the conditions upon which the technicians' would receive payment. These determinations are made by the Installation Companies. (*See, e.g.*, Pl.'s Mem. at 32; Ex. 2, Selvyn Dep. at 235); *see also Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2003) (evaluating similar facts when considering the factor of control).

It is also significant that the control Comcast does exercise is in part designed to protect Comcast customers. *See Moreau*, 356 F.3d at 951. Technicians enter the residences of Comcast customers to perform installations. Any company concerned about its customers' safety would be careless to blindly delegate in-home installation responsibilities without verifying that jobs are satisfactorily completed. Comcast's quality control procedures ultimately stem from the nature of their business and the need to provide reliable service to their customers, not the nature of the relationship between the technicians and Comcast. While Comcast's supervision and control may appear substantial in degree, it is qualitatively different from the control exercised by employers over employees.

C.

Plaintiffs next contend that Comcast exercises control over the Installation Companies' pay structure. However, Comcast's involvement in the pay structure of the Installation Companies is typical of any client/independent contractor relationship. Comcast does not issue the technicians' pay checks, pay stubs, or W-2s, nor do the technicians submit pay records or timesheets to Comcast. (Def.'s Mem. at 9-10; Ex. G, Calhoun Dep. at 84-85; Ex. D, Dyer Dep. at 39-40; Ex. H, Chappell Dep. at 37.) Plaintiffs have provided no evidence indicating that Comcast tells the Installation Companies how to pay its employees. Instead, Plaintiffs claim Comcast has control over their wages simply because Comcast pays the Installation Companies on a per service basis, and the Installation Companies pay technicians on a per services basis. To find that this arrangement places Comcast in control of Plaintiffs' wages would dramatically expand the FLSA to subsume traditional independent contractor relationships. *See Herman*, 164 F. Supp. 2d at 675 (noting that a self determined opportunity for profit or loss due to per service payments indicates contractor status). An employee's income, received from its direct employer,

will always be "determine[d] and influence[d]" by what a contractor decides to pay the direct employer for services rendered by the employee. *See Tafalla v. All Fla. Dialysis Serv., Inc.* 2009 U.S. Dist. LEXIS 3802 (S.D. Fl. 2009) (concluding that payments from a hospital to a contractor, which the contractor uses to pay its employees does not amount to the hospital's control over the employees' pay). The Installation Companies, not Comcast, determine whether to pay their employees on a per service or salary basis, and at what rate. Plaintiffs have produced no evidence indicating Comcast's authority over these decisions.

D.

Plaintiffs also contend that Comcast's record retention is indicative of Joint Employment. Comcast does maintain some records, including (1) arrival and departure data for each cable technician, (Pl.'s Mem. at 36; Ex. 5, Crouse Dep. at 23-24), (2) lists of cable technicians and their employment status, reasons underlying any terminations, and information on the vehicles they drive, (*id.* at 37; App. A, Comcast 00008026-00008028), and (3) drug testing and criminal background information on all cable technicians. (*Id*. at 38; App. A, Comcast 00000060-00000065.) While the retention of these records might on the surface seem to evidence an employment relationship, upon closer scrutiny the retention of the records is only an extension of Comcast's control procedures. "It is only good business sense for Comcast . . . to attempt to insure that [technicians] are fit" to enter customer's homes. *Herman*, 164 F. Supp. 2d at 673. No such effort could be made without the retention of the personnel and performance based records retained by Plaintiffs. The information reflected in these records is used to ensure that Comcast receives the services for which it is entitled, and that the individuals fulfilling them are authorized to do so. Plaintiffs have presented no evidence to indicate that the maintenance of

12

this type of information is used to control a technician's day to day employment, or that Comcast retains records for any purpose beyond quality control.

IV.

For these reasons, I find that the four *Bonnette* factors do not dictate that Comcast should be considered as a joint employer of Plaintiffs. There remains to be considered the three additional factors suggested in *Zheng v. Liberty Apparel Co.*, 355 F.3d at 72. These factors, considered either individually or in the aggregate, do not establish that there is a triable issue of fact as to whether Comcast is liable to Plaintiffs under the FLSA.

The first factor is whether Comcast's premises or equipment are used for Plaintiff's work. Plaintiff does provide technicians with "star keys," a specialized tool required to unlock Comcast boxes. (Pl.'s Mem. at 40; Ex. 4, Donahue Dep. at 87-90.) This key, however, is the only piece of equipment that Comcast supplies. It does not provide technicians with uniforms, vehicles, or other tools. (Def.'s Mem. at 23-26; Ex. D, Abbott Decl. at ¶ 31.) Moreover, each Installation Company has premises out of which the technicians work.

The second *Zheng* factor is whether Plaintiffs are part of a business organization that can shift as a unit from one putative joint employer to another. This factor is relevant "because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arraignment than a subcontractor that serves a single client." *Zheng*, 355 F.3d at 72. The record establishes that the Installation Companies work primarily, if not exclusively, for Comcast. However, by itself, the absence of a single client base is not a proxy for joint employment because it is "perfectly consistent with a legitimate subcontracting relationship." *Zheng*, 344 F.3d at 72.

Finally, *Zheng* asks that a court inquire whether the contract responsibilities of the direct employer can be transferred to the putative joint employer without material changes. In *Rutherford Food Corp. v. McComb*, 331 U.S. 72 (1947) from which *Zheng* is derived, the putative joint employer constantly replaced its subcontractor, and despite the changeover, the same employees would continue to do the same work from the exact same place. *Rutherford*, 331 U.S. at 725. This continuity suggested that the employees were tied to the putative joint employer, rather than the subcontractor. However, where "employees work for [the purported joint employer] only to the extent that their direct employer is hired by that entity, this factor does not in any way support the determination that a joint employer relationship exists." *Zheng*, 355 F.3d at 74.

In the instant case Plaintiffs have introduced Comcast emails in which Comcast employees discussed the possibility of the dissolution of an Installation Company. (Pl.'s Mem. at 46; App. A, Comcast 10052909.) Plaintiffs contend that these emails reveal a situation analogous to the turnover of subcontractors in *Rutherford*. However, unlike the subcontractors in *Rutherford*, the Installation Companies are "going concern[s] with a location, facilities, equipment, employees, supervisors and owners." *Zhao*, 247 F. Supp. 2d at 1160 (discussing a comparable business relationship). As the emails themselves indicate, when an Installation Company dissolves, technicians wishing to continue working on behalf of Comcast are required to apply and be hired for a position from another Installation Company. Thus, the emails clearly indicate that the technicians only work for Comcast to the extent their Installation Company is hired to do so. This weighs against a joint employer relationship. *Zheng*, 355 F.3d at 74.

In sum, although the issue is not free from doubts, I conclude that Comcast is not Plaintiff's joint employer within the meaning of the FLSA. Accordingly, Comcast's motion for summary judgment will be granted.


DATE:   September 28, 2010                    ___/s/_____
                                              J. Frederick Motz
                                              United States District Judge